IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JESSE O'QUINN and | § | |
| ALBERT BENNETT | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. 4:16-cv-1203 |
| v. | § | |
| | § | |
| CITY OF HOUSTON, TEXAS, | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiffs Jesse O'Quinn and Albert Bennett (respectively "O'Quinn" and "Bennett" or collectively as "Plaintiffs"), file this Original Complaint against Defendant City of Houston, Texas, and for their causes of action respectfully show the Court as follows:

## I.
## INTRODUCTION

1.     This action seeks equitable relief, compensatory and punitive damages, liquidated damages, attorney's fees, expert witness fees, taxable costs of court, pre-judgment and post-judgment interest for race and color discrimination and retaliation, in violation of Title VII, suffered by Plaintiffs in the course of their employment with Defendant.  Plaintiffs complain that they were discriminated against regarding the terms and conditions of their employment based on their race and color and retaliated against after they opposed unlawful race discrimination, racial harassment and retaliation in the workplace.

2.     Plaintiffs filed Charges of Discrimination with the Texas Workforce Commission - Civil Rights Division under the worksharing agreement - and the EEOC on claims relating to

this discrimination and asked to EEOC to investigate on behalf of both agencies against the Defendant. Plaintiffs have been given right to sue letters for their discrimination. All administrative prerequisites have occurred.

3.      Plaintiffs demand a jury on all issues triable to a jury

## II.
## PARTIES

4.      Plaintiff Jesse O'Quinn is a Texas resident.

5.      Plaintiff Albert Bennett is a Texas resident.

6.      Defendant City of Houston, Texas is a governmental entity. The City of Houston employs Plaintiff. Service of the Summons and this Petition may be made by serving Anna Russell, its City Secretary, at 900 Bagby Street, Houston, Texas 77002 under the authority of TEXAS CIVIL PRACTICE & REMEDIES CODE § 17.024(b).

7.      Whenever in this Complaint it is alleged that Defendant committed any act or omission, it is meant that the Defendant's officers, directors, vice-principals, agents, servants, or employees committed such act or omission and that at the time such act or omission was committed, it was done with the full authorization, ratification, or approval of Defendant or was done in the routine normal course and scope of employment of the Defendant's officers, directors, vice-principals, agents, servants, or employees.

## III.
## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331.

9.      This Court has personal jurisdiction over City of Houston, Texas and venue is proper in Harris County, Texas because all or a substantial part of the events or omissions giving

rise to Plaintiff's claims occurred in Harris County, Texas, and at all times relevant to this causes of action against City of Houston, Texas, accrued, Plaintiffs worked for City of Houston, Texas in Harris County, Texas.

**IV.**
**CONDITIONS PRECEDENT TO SUIT**

10.     All conditions precedent to filing this cause of action have been met.

**A.  O'QUINN**

11.     O'Quinn filed a complaint of discrimination against Defendant under Charge Number 460-2009-04919 with the Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission Civil Rights Division ("TWC-CRD") on or about September 15, 2009.

12.     On or after January 29, 2016, the United States Department of Justice issued a Notice of Right to Sue letter entitling O'Quinn to file an action in this Court for his claims.

13.     This action is filed within ninety (90) days of O'Quinn's receipt of the Notice of Right to Sue Letter from the Department of Justice.

**B.  BENNETT**

14.     Bennett filed a complaint of discrimination against Defendant under Charge Number 460-2009-04916 with the Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission Civil Rights Division ("TWC-CRD") on or about September 15, 2009.

15.     On or after January 29, 2016, the United States Department of Justice issued a Notice of Right to Sue letter entitling Bennett to file an action in this Court for his claims.

16.    This action is filed within ninety (90) days of Bennett's receipt of the Notice of Right to Sue Letter from the Department of Justice.

**VII.**
**FACTUAL BACKGROUND**

17.    Plaintiffs are black, African-American, citizens of the United States.

18.    Plaintiffs are employed by Defendant as firefighters in the Houston Fire Department ("HFD").

19.    At all times, Plaintiffs were qualified for the positions they held for Defendant during their employment.

**A.  O'QUINN**

20.    Jesse O'Quinn joined the Houston Fire Department in 2002.

21.    In February 2009, O'Quinn went with a civilian colleague to teach a Juvenile Firestoppers class at Fire Station 41.

22.    As he was leaving the station, O'Quinn saw a hangman's noose hanging in a firefighter's open locker.

23.    O'Quinn felt that the hangman's noose was offensive and threatening.

24.    O'Quinn took a picture and reported it to a colleague, who said not to worry about it.

25.    When he returned to his office, O'Quinn went to a senior colleague, Al Bennett, for advice.

26.    O'Quinn and Bennett discussed it for some time, and decided to discuss how to handle the situation with Deputy Chief Flanagan, a black male on the command staff.

27.    O'Quinn and Bennett spoke with Chief Flanagan and relayed the incident.

4

28.    Chief Flanagan asked O'Quinn whether the firefighter was rude to him.

29.    Flanagan said "if not, no harm, no foul."

30.    O'Quinn and Bennett then spoke to Chief Longoria about the incident.

31.    The following day, February 18, 2009, O'Quinn saw Bennett come out of the Captain's office, where he appeared to have been meeting with Captain Beda Kent and Captain Ponce-Lopez.

32.    Captain Kent was O'Quinn's immediate supervisor.

33.    Bennett told O'Quinn that he had been "written up" for insubordination for reporting the incident.

34.    Bennett told O'Quinn that he would not be written up.

35.    Bennett had asked them not to write O'Quinn up, stating that it had been his idea, and that he would "fall on his sword."

36.    Although O'Quinn was not written up for the incident, his work environment became hostile immediately after the event.

37.    O'Quinn's co-workers accused him of lying, accused him of planting the noose himself, and accused him of complaining about a noose when the rope was really something else.

38.    The firefighter who owned the noose subsequently came forward to state that it was a noose—not a "fisherman's knot" as the department initially announced.

39.    O'Quinn's house was broken into shortly after the incident and his laptop computer, city cell phone, and television were stolen, among other things.

40.    O'Quinn's supervisors openly questioned whether he was being truthful about the thefts.

41.    O'Quinn gave his supervisors the police report to prove that he was being truthful.

42.    O'Quinn was no longer trusted to do his job, and he was required to document everything to avoid being disciplined or questioned.

43.    On Wednesday, September 9, 2009, O'Quinn was told that he could no longer work out and exercise with his colleagues Al Bennett and Kenyada Parker.

44.    O'Quinn, Bennett and Parker were the only three Black / African American firefighters out of eleven firefighters working in the public affairs office.

45.    There were no limitations placed on the other firefighters in their office limiting the employees with whom they were allowed to work out.

46.    O'Quinn was told that he was allowed to work out with any of the non-Black firefighters.

47.    O'Quinn was told that when the Black firefighters worked out and were observed laughing, some of the supervisors interpreted that action to be that they were not working.

48.    O'Quinn had never heard of any other firefighter being told that if they laughed while exercising that it was interpreted as not working during their shift.

49.    In addition, O'Quinn was subjected to unequal treatment by being required to respond to documentation of insignificant events that non-Black firefighters were not required to document.

50.    Furthermore, O'Quinn's actions on and off the job became scrutinized and watched more closely than non-Black firefighters.

51.    At least one former supervisor of O'Quinn began making a concerted effort to isolate O'Quinn and bias other supervisors against me by telling everyone that O'Quinn is trouble, should be avoided, needed to be watched closely, and was a problem employee.

6

52.    All of those actions created an environment that hindered O'Quinn's ability to perform his job.

**B.  BENNETT**

53.    Albert Bennett joined the Houston Fire Department in 1997.

54.    Since he joined the Houston Fire Department, Bennett has been subjected to overt racial discrimination and hostility.

55.    During his employment, Bennett filed two complaints with the Office of Inspector General ("OIG") during his tenure, both of which were sustained.

56.    In the first instance, other firefighters refused to ride in the same car with Bennett because of his race.

57.    Bennett reported the incident to the Captain, and later to OIG, which sustained Bennett's complaint.

58.    In the second instance, a co-worker complained that Bennett should not have received a tenured position and stated to Bennett that he would not have received the position and benefits (including a take-home car) if he were white.

59.    Bennett complained about this hostility to OIG, and it sustained Bennett's complaint.

60.    In February 2009, a junior colleague in the Public Affairs Department, Jesse O'Quinn, approached Bennett after returning from an assignment at Fire Station 41.

61.    O'Quinn had seen a hangman's noose hanging in a firefighter's open locker in the fire station.

62.    O'Quinn came to Bennett for advice and showed him a picture he had taken.

63.    O'Quinn thought it was threatening and offensive and asked Bennett if anything could be done about it.

64.    They discussed it and Bennett suggested that O'Quinn ask someone with more experience and hopefully that person could direct him about what to do.

65.    Bennett accompanied O'Quinn to see Assistant Chief Flanagan, a black male on the command staff.

66.    They spoke with Chief Flanagan briefly, relayed the incident, and he advised them not to pursue the issue.

67.    As they were leaving, Bennett saw Assistant Chief Longoria, who is the supervisor of Bennett's department, and they briefly spoke to him about the incident, as well.

68.    The following day, February 18, Bennett was called into a meeting with Chief Longoria, Captain Beda Kent, Bennett's immediate supervisor, and Captain Ponce-Lopez.

69.    At that meeting, Bennett was told that it was inappropriate for him to speak with Chief Flanagan and that he was going to be disciplined by having a statement included in his permanent personnel file for insubordination because he had talked to Chief Flanagan about the noose.

70.    At the time, Bennett was visibly upset, and indicated to them that he did not think it was acceptable to discipline him for asking for advice from a supervisor about a racist symbol.

71.    Bennett complained to Staff Services about the reprimand in his file.

72.    Bennett believed that is was done in retaliation for him raising the issue of the hostile work environment toward African Americans in the Houston Fire Department.

73.    The retaliatory actions toward Bennett continued throughout the spring.

8

74.    A civilian colleague accused Bennett of planting the noose himself.

75.    In addition, Bennett received emails and phone calls accusing him of having placed the noose in the locker.

76.    The noose had been seen in a locker in a Fire Station where Bennett did not work and had not visited.

77.    The firefighter who owned the noose subsequently admitted that the noose was his.

78.    Bennett told the Fire Chief and the Command Staff that he had not planted the noose, and that he was willing to take a polygraph examination to prove it.

79.    Bennett's offer was refused and no OIG investigation of the retaliation took place.

80.    Bennett's supervisor later stated that Bennett was not written up because of the complaint about the noose, but because Bennett had not given the Fire Chief sufficient notice of the date of an event that Bennett was planning, the Trailblazer Breakfast.

81.    The reason later given by Defendant was false.

82.    The Trailblazer breakfast is an annual event that Bennett plans on his own, and it had not come up in the meeting on February 18.

83.    Bennett's co-workers then created a hostile work environment for him and began undermining Bennett making it difficult for him to do his job.

84.    Bennett's supervisors instructed others to "watch out for" Bennett and O'Quinn, to report on their activities, and expressly stated that they are not trustworthy and cannot be trusted.

85.     Plaintiffs' jobs require trust of the public and their co-workers, and suggestions that they cannot be trusted directly threaten their jobs.

86.     In addition, on September 9, 2009, Captain Ponce told Bennett that he could no longer work out or do other activities outside of assignments with O'Quinn.

87.     All of Plaintiffs' co-workers are permitted to exercise together (whether by running or going to the gym), but Plaintiffs' were expressly ordered not to do so.

88.     When Bennett questioned the reason for this directive and stated his belief that it was because they are black, Captain Ponce agreed.

**C.  Additional actions**

89.     The City of Houston, Texas Fire Department has engaged in a pattern and practice of targeting Black / African American firefighters and subjecting those firefighters to harassment and a hostile work environment.

90.     The actions directed towards O'Quinn and other Black / African American firefighters were demeaning, humiliating, hostile, aggressive, unprofessional, and constituted harassment that was severe, egregious, pervasive and altered the terms and conditions of their employment.

91.     Plaintiffs were targeted for harassment, a hostile work environment, and discrimination because of their race / color.

92.     Plaintiffs were retaliated against after they opposed unlawful racial harassment in the workplace.

**VIII.**

## CAUSE OF ACTION—
## DISCRIMINATION/HOSTILE WORK ENVIRONMENT

93.     Each and every allegation contained in the foregoing paragraphs is realleged as if fully rewritten herein.

94.     As described above, Plaintiffs have been subjected to discrimination and a hostile work environment based on their race and color, in violation of Title VII, 42 U.S.C. § 2000e, *et seq.*

95.     During their employment with the City of Houston, Plaintiffs have been subjected to disparate treatment regarding compensation and assignments because of their race and color. These conditions have resulted in segregation between the various fire stations and shifts, and have led to violations of Title VII and the Equal Pay Act, 29 U.S.C. § 206(d).

96.     Defendant did not make a good faith effort to comply with statutes against discrimination.

97.     Defendant knowingly, willfully, or with reckless disregard, carried out its illegal pattern or practice regarding discrimination towards Plaintiffs.

98.     Plaintiffs continue to be subjected to different terms and conditions of employment because of their race and/or color.

99.     Plaintiffs were not afforded the same terms and conditions of their employment as similarly situated employees outside Plaintiffs' protected category.

100.     Defendant allowed, failed to take any action, failed to take remedial action, failed to discipline its employees, and/or failed to take any corrective action, thereby allowing and facilitating the continuance of the discrimination and harassment towards Plaintiffs.

11

101.   The conditions described above led to a hostile work environment because of the following conditions:

      a.     Severe and/or pervasive;

      b.     Outrageous conduct;

      c.     Demeaning conduct;

      d.     Failure to take prompt remedial action;

      e.     Affected terms and conditions of Plaintiffs' employment;

      f.     Did not provide sufficient recourse.

102.   Further, Defendant acted with malice or, in the alternative, with reckless indifference to the federally protected rights of the Plaintiffs.

103.   As a result of Defendant's actions or inaction in violation of Title VII, Plaintiffs have suffered loss of wages and benefits, both in the past and in the future, as well as emotional pain, mental anguish, suffering, inconvenience, and loss of enjoyment of life in the past, all of which were caused by Defendant's treatment of Plaintiffs and, in all probability, Plaintiffs will continue to suffer such damages in the future.

**IX.**
**CAUSE OF ACTION—**
**<u>RETALIATION</u>**

104.   Each and every allegation contained in the foregoing paragraphs is realleged as if fully rewritten herein.

105.   During their employment, Plaintiffs opposed unlawful race discrimination, racial harassment and retaliation in the workplace.

106.    As described above, because Plaintiffs opposed unlawful race discrimination, racial harassment and retaliation in the workplace, Defendant retaliated against Plaintiffs and subjected Plaintiffs to different terms and conditions of employment.

107.    As a result of Defendant's actions in violation of Title VII described above, Plaintiffs have suffered loss of wages and benefits, both in the past and in the future, as well as emotional pain, mental anguish, suffering, inconvenience, and loss of enjoyment of life in the past, all of which were caused by Defendant's treatment of Plaintiffs and, in all probability, Plaintiffs will continue to suffer such damages in the future.

## X.
## ATTORNEYS' FEES

108.    Each and every allegation contained in the foregoing paragraphs is realleged as if fully rewritten herein.

109.    As a result of the actions stated above, Plaintiffs were forced to employ the undersigned attorneys.

110.    As a result of Defendant's conduct, Plaintiffs are entitled to recover from Defendant their reasonable attorneys' fees for bringing this action pursuant to the applicable statutes, as well as the costs incurred in this action and any and all appeals of this action.

## XI.
## DAMAGES

111.    Each and every allegation contained in the foregoing paragraphs is realleged as if fully rewritten herein.

112.    As a result of Defendant's violations of Title VII. Plaintiffs seek the following relief: (1) loss of wages and benefits in the past and the future; (2) costs of court, expert fees and attorneys' fees; (3) mental anguish and emotional distress in the past and future (4) any punitive,

equitable or liquidated damage provided by law, and (5) pre-judgment and post-judgment interest as allowed by all relevant statutes.

113.    Also, since Defendant's actions were committed with reckless indifference to Plaintiffs' statutorily protected rights, Plaintiffs are entitled to recover punitive damages in an amount sufficient to deter Defendant and others similarly situated from this conduct in the future.

114.    Additionally, since Defendant's actions were committed willfully, Plaintiffs seek any additional damages allowed under the relevant statutes.

## XII.
## JURY DEMAND

115.    Plaintiffs request a trial by jury on all issues triable by a jury.

## XIII.
## REQUEST FOR RELIEF

116.    Each and every allegation contained in the foregoing paragraphs is realleged as if fully rewritten herein.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that they have judgment against the City of Houston for (a) the full amount of Plaintiffs' actual damages; (b) the full amount of Plaintiffs' pecuniary damages and losses; (c) punitive damages; (d) Plaintiffs' attorneys' fees; (e) pre-judgment and post-judgment interest at the highest allowable legal rate; (f) all of Plaintiffs' taxable costs; (g) mental anguish damages; and (h) all such other and further relief, both at law and in equity, to which Plaintiffs may be justly entitled.

Respectfully submitted,


By:    /s/  Joseph Y. Ahmad
Joseph Y. Ahmad
Texas Bar No. 00941100
joeahmad@azalaw.com
AHMAD, ZAVITSANOS, ANAIPAKOS,
ALAVI & MENSING P.C.
1221 McKinney Street, Suite 2500
Houston, Texas  77010
Telephone:  (713) 655-1101
Telecopier:  (713) 655-0062

Of Counsel:
        Nasim Ahmad
        Texas Bar No. 24014186
        nahmad@cline-ahmad.com
        CLINE | AHMAD
        723 Main Street, Suite 904
        Houston, Texas 77002
        Telephone:  (832) 767-3207
        Telecopier:  (281) 864-4379


ATTORNEY FOR PLAINTIFFS
JESSE O'QUINN AND ALBERT BENNETT